749 So.2d 331 (1999)
Douglas E. BARFIELD, Appellant,
v.
STATE of Mississippi and Deborah Madden Barfield, Appellee.
No. 97-CP-01467-COA.
Court of Appeals of Mississippi.
September 28, 1999.
*332 Appellant pro se.
Clayton Lockhart, Jackson, Attorney for Appellee.
BEFORE McMILLIN, C.J., BRIDGES, AND PAYNE, JJ.
BRIDGES, J., for the Court:
¶ 1. Appellant Douglas E. Barfield and Ms. Deborah Madden Barfield divorced in January of 1990 on the grounds of irreconcilable differences. Pursuant to the "Property Settlement Agreement" executed by the parties and incorporated into the final judgment of divorce, Mr. Barfield was required to pay $1,000 per month for child support.
¶ 2. In 1993, the Chancery Court of the First Judicial District of Hinds County cited Mr. Barfield for contempt and rendered a judgment against him for $36,000 in past due child support. The State of Mississippi, on behalf of Ms. Barfield, filed its petition for citation for contempt on March 27, 1997.[1] Mr. Barfield responded with affirmative defenses and filed a motion for relief from the final judgment of divorce or, in the alternative, for modification of the final judgment of divorce.[2] The court again cited Mr. Barfield for contempt, rendered a judgment against him *333 for $84,693, and modified his child support obligation to $155 per month.
¶ 3. From this judgment, Mr. Barfield appeals pro se, citing for our review and resolution two assignments of error, which we quote verbatim from his brief:
1. WHETHER THE CHANCERY COURT, HAVING FOUND THAT A CHILD SUPPORT ORDER WHICH REQUIRED THAT ONE THOUSAND, THREE HUNDRED, THIRTY-THREE DOLLARS ($1,333.00) PER MONTH BE PAID FOR ONE CHILD WAS EXCESSIVE AT THE TIME IT WAS ENTERED, WAS THEREBY OBLIGATED UNDER THE LAW AND RULES OF EQUITY TO DECLARE THAT ORDER VOID.
2. WHETHER AN ORDER WHICH REQUIRED A MONTHLY PAYMENT OF ONE THOUSAND, THREE HUNDRED DOLLARS ($1,333.00) BE PAID TO SUPPORT ONE CHILD; ENTERED AT A TIME WHEN THE OBLIGOR WAS UNEMPLOYED AND WAS LIKELY TO BE EMPLOYED AT LOW WAGE WORK INDEFINITELY; AND WAS WITHOUT COUNSEL, WAS SUFFICIENT EVIDENCE TO CONCLUDE THAT A FRAUD WAS PERPETRATED ON THE COURT BLOW.
¶ 4. We affirm the decision of the chancery court.

I. FACTS
¶ 5. Mr. Barfield and Ms. Barfield married on August 2, 1986 and had one child, John W. Barfield, born on March 21, 1988. In seeking an uncontested divorce, the parties signed a property settlement agreement which provided that Ms. Barfield would maintain custody of the child and that Mr. Barfield would pay child support in the amount of $1,000 per month. Mr. Barfield also agreed to assign his rights to dividends and bonuses accruing on his 200 shares of common stock in R.E. Barfield, Inc., to Ms. Barfield, for the benefit of the minor child. The property settlement agreement was ratified by the Chancery Court of the First Judicial District of Hinds County and incorporated into the final judgment of divorce.[3]
¶ 6. After Mr. Barfield failed to pay the agreed child support, Ms. Barfield sought a citation for contempt. On June 7, 1993, the chancery court rendered a judgment against Mr. Barfield for the arrearage of $36,000. Ms. Barfield subsequently assigned her rights to collect the child support to the State of Mississippi. The State filed a petition for citation for contempt on March 27, 1997, and Mr. Barfield filed an answer and a motion alleging fraud by Ms. Barfield and/or her attorney in misrepresenting the settlement agreement to the chancellor at the time of the divorce.
¶ 7. The Family Master for Hinds County ordered a date to be set for hearing by the Honorable Stuart Robinson, Chancellor, as soon as possible. He further ordered Mr. Barfield to pay $250 per month for child support until the hearing, with the $750 balance to continue to accrue. Before a hearing was set, federal marshals arrested Mr. Barfield in Louisiana for failure to pay child support, a violation of Title 18, U.S.C. § 228. After arraignment in federal court in Mississippi, Mr. Barfield was released on $10,000 bond. His hearing on the federal charge was continued until the state court proceedings could be completed.
¶ 8. The chancellor heard all issues of the state case on October 20, 1997 and entered his judgment denying the allegation of fraud, determining Mr. Barfield owed an arrearage of $83,900 in child support, and modifying the monthly child support *334 to $155. The court also ordered Mr. Barfield to pay the attorney's fees Ms. Barfield incurred as a result of the fraud allegation.

II. TRIAL
¶ 9. Prior to presenting evidence, the parties discussed the effect of the federal charges against Mr. Barfield on the state proceedings. The chancery court proceeded with the trial of the civil action against Mr. Barfield, leaving the criminal action to the federal court.
¶ 10. The State, acting as the plaintiff on behalf of Ms. Barfield, called Ms. Barfield as its first witness. Ms. Barfield recalled that Mr. Barfield was supposed to pay $1,000 per month for child support pursuant to the divorce decree and that he had been found in contempt for nonpayment of $36,000 in 1993. She said that she received only five payments in 1995 for a total of $1,450 and that she incurred expenses for her child's medical and dental benefits because Mr. Barfield did not fulfill his obligation to maintain a health insurance policy. These expenses were reflected in withholdings listed on Ms. Barfield's paycheck stubs.
¶ 11. Ms. Barfield testified that she received sporadic dividend payments from the stock, but she did not receive the stock itself, and the payments stopped in 1993. She received the dividends quarterly in checks for either $1,000 or $500, but she recalled receiving only two dividend payments after February of 1993. She identified four $1,000 checks payable to Douglas Barfield.
¶ 12. Ms. Barfield's attorney discussed Mr. Barfield's appeal of the 1993 judgment against him and noted that Mr. Barfield was aware of the terms of the divorce decree at that time. Ms. Barfield's attorney argued that Mr. Barfield should have pursued his appeal at that time, that the fraud issue was untimely as to Rule 60 M.R.C.P., and that raising the issue of fraud at the current hearing was prohibited as res judicata. Mr. Barfield asserted that the judge who heard the 1993 petition for citation for contempt "refused to hear any matters bearing on the validity of the final judgment of divorce and said [Chancellor Robinson] needed to hear that because this was [his] case to begin with [sic]." Barfield's appeal of that ruling was dismissed by the supreme court after Mr. Barfield failed to file a brief or pay court costs. Chancellor Robinson noted that the other judge could have interpreted the original decree and stated, "I mean we sign these things on irreconcilable differences every day and don't even look at the agreement."[4] The chancellor decided to allow Mr. Barfield to make a record on the fraud issue so that the appellate court could review it.
¶ 13. Ms. Barfield was represented in the divorce by her employer at that time, Attorney Marcia Smalley. Ms. Barfield said that she typed the property settlement agreement which Ms. Smalley drafted. Ms. Barfield stated that she and Ms. Smalley were present in Ms. Smalley's office when Mr. Barfield signed the agreement. She acknowledged that Mr. Barfield had recently undergone both professional and personal crises when the agreement was executed, but she said that he told her that he was employed. Having read in the newspaper about his disbarment, she knew that he was not practicing law. Ms. Barfield testified that Mr. Barfield offered the $1000 per month in child support because he had a job in Tennessee. She said that he put no restrictions on that amount, and she clarified that the R.E. Barfield, Inc.'s stock dividends were to be paid in addition to the $1,000 per month for child support.
¶ 14. Ms. Fontella Shelton, the supervisor of payment processing at Mississippi *335 Child Support, testified that she had reviewed the payments received and paid in this case and that Mr. Barfield owed $88,900 as of the day of the hearing, October 20, 1997. She affirmed that the payments under the temporary order were up to date. The State clarified that the $88,900 did not include the money that Mr. Barfield owed to Ms. Barfield for insurance premiums, and then the State rested.
¶ 15. The defense called Marcia Smalley, who testified that she represented Ms. Barfield in the divorce, and that she drafted the separation agreement. Ms. Smalley recalled that the property settlement agreement included a provision for child support, but she could not recall the amount. She remembered that Mr. Barfield owned stock in a Western Auto and that dividends were paid on a regular basis on that stock. Although she could not recall whether the provision assigning the dividends was associated with the child support, she stated that the property settlement agreement would have reflected her understanding of the agreement between the parties. On cross-examination, she noted that the paragraph regarding dividend payments did not mention child support and that it provided for the dividends to be paid directly to the child of the parties after he reached the age of twenty-one.
¶ 16. Ms. Smalley stated that she had no personal knowledge of Mr. Barfield's financial condition when the agreement was executed because a complete financial declaration was not required. She did not recall ever employing Mr. Barfield, but she might have asked Mr. Barfield to serve process for her, and she believed that she handled an account for him by collecting past due fees.
¶ 17. Ms. Smalley did not remember who typed the agreement or whether she was present when Mr. Barfield signed the agreement, but she believed that she was present because she notarized his signature. She said that she was frequently away from the office at trial, and her employees were not closely supervised, but she offered her opinion of Ms. Barfield's honesty:
I think she was totally trustworthy and honest. I never hesitated to leave anything in Ms. Madden's [Ms. Barfield's] care.... I didn't have an office manager per se. But if I'd had one, it would have been Deborah. And I entrusted everything in my office to her without hesitation whatsoever.
While maintaining that it was unlikely that Ms. Barfield would have replaced a page of the agreement, Ms. Smalley acknowledged the possibility because the pages were printed on the word processor in the office.
¶ 18. Ms. Smalley said that she usually mailed an attested copy of the final divorce decree and property settlement agreement directly to an opposing party who was not represented by counsel. She did not remember Mr. Barfield ever indicating that he did not receive a copy of the decree. She had no memory of Mr. Barfield writing an interlineation regarding his ability to pay child support, and she importuned that she would not have participated in the fraudulent substitution of pages by anyone in her office. She verified that she personally presented the decree to the court.
¶ 19. Next, Mr. Barfield testified that, at the time of the hearing, he was a loan counselor of United Companies Lending Corporation earning $1,577.34 per month, the most money he had earned since the divorce. He said that he was unemployed and living with his mother in Natchez at the time of the divorce. He moved to Jackson and worked part-time delivering pizzas, but pursuant to a conviction of fraud under a contract, Mr. Barfield was sentenced to a restitution center and worked at a grocery store. His income was paid as restitution under the court order of his conviction.
¶ 20. After he experienced a fainting spell at the grocery store, his employment was terminated with a suggestion that he find a less rigorous occupation. He moved *336 to Kosciusko and lived with his grandmother while he received treatment for his condition. Unable to obtain a job, he studied environmental science at Jackson State University for a year. When he ran out of money for school, a man named Lowery hired him to scout locations for a restaurant. Mr. Barfield moved to Baton Rouge in 1995 and found the loan counselor job while studying at Louisiana State University.
¶ 21. Mr. Barfield asserted that June 1997 was the first month since the divorce that he earned a thousand dollars and that he had never been financially able to pay $1,000 per month for child support. Although he claimed that he made at least six child support payments in 1996, he could not locate records of those payments. He identified four $1,000 checks which he had endorsed to Ms. Barfield and explained that the method of paying the stock dividends to Ms. Barfield changed when his grandmother died in 1993. R.E. Barfield, Inc., was partially liquidated in 1995, and no dividends were paid after the second quarter of that year.
¶ 22. Mr. Barfield testified that he traveled from Natchez to Jackson after Ms. Barfield notified him that the property settlement agreement had been completed. He said that Ms. Barfield knew that he was unemployed and that they had generally agreed on the terms for dividing the property, but he claimed that they never discussed child support in the amount of $1,000 per month. He described a job that he was considering for a salary of about $50,000 per year, and he explained that the potential employer did not get the government contract upon which the job was contingent.
¶ 23. Mr. Barfield said that he read the property settlement agreement in its entirety before he signed it, but he claimed that he wrote "in the lines" that he would pay the $1,000 per month in child support "if, and only if, I had the job in Oak Ridge, Tennessee with Jaycor, Inc., and was making that kind of money, was making $50,000 a year so that I could pay this amount of money." He said that he included the alternative that he would pay the statutory amount if he did not get the job in Tennessee and that he wrote that provision in the left margin just like another amendment which appeared in the ratified agreement. Mr. Barfield claimed that he would never have agreed to pay $1,000 per month in child support without the amendment written in the margin.
¶ 24. Mr. Barfield characterized his state of mind at the time that he signed the agreement as "desperate," noting that he had just been disbarred, he was facing possible conviction of a crime, and he had been kicked out of his apartment because he could not pay the rent. He testified that he had a copy of the agreement he signed when he left Ms. Smalley's office, but he lost it, and he claimed that he never received an attested copy of the final judgment as entered in the chancery court. Therefore, he was unaware of the requirement that he pay $1,000 per month for child support until he was served with the 1993 petition for citation for contempt. Mr. Barfield explained that he could not afford an attorney to represent him in that appeal and that he could not write a brief at that time.
¶ 25. On cross-examination, Mr. Barfield admitted that he had no documentary evidence to support his claim of fraud and that his case was based upon his word and the fact that someone had the motive and opportunity to change the wording of the agreement after he signed it. Recognizing that his truthfulness was an issue in the case, he responded to questions about his disbarment. He confirmed that his disbarment resulted from his providing misinformation in his resume to a law firm. He confessed that he pleaded guilty to fraud under contract and was required to pay restitution. He said that the factual allegations of fraud were in the 1993 transcript but were not specifically stated in his 1993 responsive pleading.
*337 ¶ 26. Although Mr. Barfield testified that he made an entry upon the minute book of R.E. Barfield, Inc., assigning the stock dividends to Ms. Barfield, he failed to produce that entry in response to discovery efforts. When the State questioned the validity of the assignment, Mr. Barfield explained that he usually endorsed the dividend checks before they were sent to Ms. Barfield. He claimed that two additional dividend checks were paid to Ms. Barfield, but he could not locate the checks, and he did not bring corporate records showing that the checks were mailed.
¶ 27. Mr. Barfield answered questions about his assets and his occupations since the divorce. He confirmed that he had an unencumbered, undivided one-half interest in a building in Kosciusko estimated at a value of $50,000 on his financial statement and currently leased to tenants for $500 per month. The building was assessed at a value of $85,000. He certified that he owned one-third of the family business and valued his share at $6,000. Although Mr. Barfield testified that he did not own a vehicle, he clarified that he drove a 1995 Lumina purchased by R.E. Barfield, Inc., in 1995. He said that he paid some money to the corporation for personal use of the vehicle, but he had been unable to pay very much for it. Mr. Barfield retained a remainder interest in his mother's house in Natchez, and he estimated that the house might appraise for $50,000.
¶ 28. Mr. Barfield maintained that for several years he did not file a tax return because his income was too low. His employer, Mr. Lowery, paid his rent and bought him food for part of 1994, but Mr. Barfield purportedly received too little money to owe any taxes. He detailed his schedule and course load as a student at LSU, and he discussed his income and expenses since moving to Baton Rouge to study environmental science. He described his attempts to find employment, including his attempts to find non-lawyer jobs within the legal profession.
¶ 29. Mr. Barfield attested that his 1993 pleadings did not include a request for a modification of the $1,000 per month child support obligation and that he could not request a modification earlier because he could not find an attorney to represent him. He acknowledged that the amount of the child support obligation in the divorce decree was definite. He said that he borrowed money from his mother and another woman to pay his current lawyers the $2,500 fee. Mr. Barfield considered the dividend payments to be child support, and he asserted that they were not separate because they fell under the "child support" heading in the agreement. He said that he requested the court to take those payments into consideration at the 1993 hearing and to reduce the amount he owed by the amount of the dividends paid to Ms. Barfield.
¶ 30. Barfield rested his case, and the parties stipulated that Ms. Barfield had incurred $1,586 in medical expenses and sought to be reimbursed by Mr. Barfield for $793. Ms. Barfield testified regarding her attorney's fees which she incurred in defending against the fraud allegations, and the attorney's billing statement was introduced into evidence.
¶ 31. The chancery court rendered the following ruling:
As far as the fraud allegation is concerned, of course, the burden is placed on Mr. Barfield to prove that there has been fraud in this case. The only thing we have is two witnesses testifying against each other. The judgment in the file states that he'll pay $1,000 per month child support. He states that he was given a copy at the time this property settlement agreement was prepared and that the copy had his notations in the margin, but for whatever reason that copy apparently doesn't exist any more. Judging the credibility of the witnesses, which is the job of this Court, I'm going to deny his allegation of fraud. I think there is no basis for it. And everything considered, it just does not stand up.

*338 Now, as far as the arrearage is concerned, I'm going to treat this as civil contempt since there is an indictment in Federal Court pending, and I'm not going to get involved in conflict with that. The testimony of the earlier witness concerning collecting child support was taking everything into consideration, ... the total amount was $88, 900 as of today. Giving Mr. Barfield the benefit of the doubt on these payments that were made in the form of dividends, I note five checks that have been presented today for $1,000 each. I'm going to reduce that amount by the sum of those five checks, dropping it from $88,900 to $83,900 in arrearage.
I'm going to award the attorney's fees as contained in the last exhibit in this matter, and also the stipulation as to back medical expenses that Mr. Barfield should have shared in.
¶ 32. The court examined Mr. Barfield's income and expense statement and reduced the child support obligation to the statutory fourteen percent of adjusted gross income, which totaled $155 per month. The chancellor required a withholding order for a total of $255 per month, including the $155 per month of current child support and $100 per month to be paid toward the arrearage.

III. REVIEW, ANALYSIS, AND RESOLUTION OF THE ISSUES

A. Standard of Review
¶ 33. The chancellor is afforded broad discretion in child support cases, and we will reverse only when he is manifestly wrong or has abused his discretion. Bruce v. Bruce, 687 So.2d 1199, 1202 (Miss.1996); Hammett v. Woods, 602 So.2d 825, 828 (Miss.1992). If the chancellor's findings of fact are supported by substantial credible evidence and are not manifestly wrong, they will be upheld on appeal. Anderson v. Anderson, 692 So.2d 65, 72 (Miss.1997); see Devore v. Devore, 725 So.2d 193 (¶ 8) (Miss.1998). The chancellor's findings are given particular deference "in the areas of divorce and child support." Turpin v. Turpin, 699 So.2d 560 (¶ 14) (Miss.1997); Tilley v. Tilley, 610 So.2d 348, 351 (Miss.1992); Nichols v. Tedder, 547 So.2d 766, 781 (Miss.1989).

B. Analysis of the issues raised

1. Mr. Barfield's second issue 
Was an order which required a monthly payment of one thousand, three hundred dollars ($1,333.00) be paid to support one child; entered at a time when the obligor was unemployed and was likely to be employed at low wage work indefinitely; and was without counsel, sufficient evidence to conclude that a fraud was perpetrated on the court below?
¶ 34. As the State emphasizes in its brief, fraud must be proved by "clear and convincing evidence." Norris v. Norris, 498 So.2d 809, 813 (Miss.1986); Craft v. Craft, 478 So.2d 258, 263 (Miss.1985). Mr. Barfield claims that the fact that he was unemployed at the time of the divorce and the fact that he was "likely to be employed at low wage work indefinitely" demonstrate that he would not have agreed to pay $1,000 per month in child support.[5] However, he also claims that he had a standing offer, contingent on a government contract, for a job paying $50,000 per year. He suggests that the fact that he was not represented by counsel implies fraud on the part of Ms. Barfield. It would be imprudent for this Court to allow lack of representation by counsel to imply fraud, and such an inference would be particularly misplaced in this case since *339 Mr. Barfield had completed law school and practiced law for a time prior to his divorce.
¶ 35. The only evidence that Mr. Barfield produced to suggest the possibility of fraud is testimony that Ms. Barfield had a motive and opportunity to substitute a clean page for the page on which he allegedly wrote by interlineation. He testified that his motion for fraud was based upon his version of the execution of the agreement at Ms. Smalley's office and "the circumstances and who had the opportunity to change the wording, who had an opportunity to run a fresh sheet or a fresh page, and who had the motive to do it." He claimed that he once possessed a copy of the signed agreement with his handwritten terms in the margin, but he did not produce any copy at the hearing. The chancellor had the opportunity to monitor the demeanor of the parties and to assess the credibility of each witness. He remained within his discretion in deciding that Mr. Barfield's allegations do not approximate the standard of clear and convincing evidence.
¶ 36. A finding of fraud was not supported by substantial, credible evidence. Thus, we decide this issue adversely to Mr. Barfield.

2. Mr. Barfield's first issue 
Was the chancery court obligated under the law and rules of equity to declare void an order which required that one thousand, three hundred, thirty-three dollars ($1,333.00) per month be paid for one child?
¶ 37. "When a party is unable to pay court ordered support, the proper action for him to take is to promptly file for a modification of support." Shelton v. Shelton, 653 So.2d 283, 286 (Miss.1995). The necessity of prompt action is actualized by the supreme court's holding that "support obligations to the child `vest in the child as they accrue, and no court may thereafter modify or forgive them if they be not paid.'" Gambrell v. Gambrell, 644 So.2d 435, 444 (Miss.1994) (citing Dept. of Human Serv. v. Rains, 626 So.2d 136, 138 (Miss.1993); Varner v. Varner, 588 So.2d 428, 432 (Miss.1991)). When a party neglects to promptly file for a modification, that party must "make out a clear case of inability." Shelton, 653 So.2d at 287 citing (Duncan v. Duncan, 417 So.2d 908, 908 (Miss.1982)).
¶ 38. In the case sub judice, the lower court determined that the property settlement agreement did not result from fraud and that the evidence suggested that Mr. Barfield agreed to pay $1,000 per month in child support when he signed the agreement.[6] The supreme court has submitted that property settlement agreements pursuant to divorces are "in the nature of court-approved contracts." Bell v. Bell, 572 So.2d 841, 844 (Miss.1990). "[Agreements made in the process of the termination of the marriage by divorce] are contracts, made by the parties, upon consideration acceptable to each of them, and the law will enforce them." McManus v. Howard, 569 So.2d 1213, 1215 (Miss. 1990).
¶ 39. Mr. Barfield asserts that Ms. Barfield's alleged knowledge of his unemployment and inability to make the child support payments under the agreement constitutes fraud upon the court and renders the agreement void.[7] Having eliminated the issue of fraud in executing the *340 agreement, we may assume that Mr. Barfield knew at the time of the divorce that the $1000 per month obligation was unrealistic. However, the record includes no indication that Mr. Barfield was not acting of his own free will when he signed the agreement. Because his income could be "reasonably anticipated by the parties to the agreement at the time of the agreement," he cannot now claim that the amount of the obligation was so excessive that equity requires the chancellor to declare the divorce order void. See Shipley v. Ferguson, 638 So.2d 1295, 1298 (Miss. 1994).
¶ 40. In Morris v. Morris, 541 So.2d 1040, 1041 (Miss.1989), the non-custodial father agreed to pay $950 per month in child support, "one-half (½) of all school supplies and expenses, one-half (½) of all camp costs, to provide all hospital, medical and dental insurance for the children, and to pay one-half (½) of all medical expenses of the children not covered by the insurance." When the agreement was executed, the father was receiving $1,740 per month in severance pay which he knew would end within about two months. Id. After he got a job earning $972 per month, he petitioned the court for a modification to require him to pay only $300 per month for child support. Id. at 1042.
¶ 41. The chancellor found no material change in circumstances to justify the modification, and the supreme court affirmed with the following observation:
This Court does not question Mr. Morris' sincerity in signing the Amended Agreement. However, we find that under these circumstances we must hold him to the Agreement. To allow a modification under these circumstances would effectively negate the settlement provision of § 93-5-2. The language of the Amended Agreement, particularly Item 12, is unequivocal. This Court assumes that Mr. Morris knew what he was agreeing to when he entered into the Amended Agreement. Weeks v. Weeks, 403 So.2d 148, 149 (Miss.1981). There is nothing in the record which contradicts this assumption. Not only was the trial court not manifestly in error, but it was correct when it found that there had been no material or substantial change in Mr. Morris' financial situation which would warrant modification of the Amended Agreement....
Id. Similarly, we may assume that Mr. Barfield understood the terms of his agreement when he signed it, and we find in the record nothing to contradict this assumption.
¶ 42. Also, the language of the property settlement agreement in the case sub judice is "unequivocal." Although Mr. Barfield cites Aldridge v. Parr, 396 So.2d 1027, 1030 (Miss.1981) and its progeny in asserting that an obligation of $1,000 per month for one child rendered the decree unreasonable, he fails to apprehend that the Aldridge decree was unreasonable because the amount was "indefinite[] and uncertain to such an extent that it was void." Aldridge, 396 So.2d at 1030. At the hearing, Mr. Barfield was asked, "Would you agree that notwithstanding your assertion of making interlinear notes or changes in the decree, that the original decree as it now stands before the Court was definite on the amount of child support that was to be paid?" Mr. Barfield responded, "Yes, sir, it's definite." Based upon Mr. Barfield's admission, the reasoning applied in Aldridge is not applicable to the present case, and the argument in his reply brief regarding prospective or retrospective relief under the ruling of Aldridge is irrelevant to the circumstances presented here.
¶ 43. Mr. Barfield failed to take the appropriate course of action to avoid a citation for contempt and a judgment for past due child support. He did not promptly file for a modification of the decree. The record indicates that he did not seek a modification until he was served with the second petition for citation for contempt, and he did not pursue the 1993 appeal which he claims was based upon fraud *341 even though he knew that his obligations under the court-approved property settlement agreement required him, in no uncertain terms, to pay $1,000 per month for child support.
¶ 44. Because he did not promptly seek a modification, Mr. Barfield was required to clearly show his inability to meet his obligations under the agreement in order to obtain relief from the final divorce decree. However, the evidence indicates the possibility that he could have paid the child support until he could request a modification. Mr. Barfield testified regarding several interests which could have been liquidated or used as collateral to procure the money necessary to pay child support. Those interests include the unencumbered, undivided one-half interest in a building estimated at a value of $50,000, assessed at a value of $85,000, and currently leased to tenants for $500 per month; ownership of two-hundred shares of stock, or one-third of a family business, in which his interest is valued at $6,000; and a remainder interest, which he retained when he granted a life estate to his mother in a Natchez house, which Mr. Barfield estimated would appraise for about $50,000.[8]
¶ 45. The record indicates that Mr. Barfield's expenses were minimal as he drove a company car, his employer paid his rent and bought food for him for some time, he resided with family members when necessary, he shared expenses with roommates while in school. As the State noted at the hearing, in the interim between the 1993 citation for contempt and the 1997 hearing which led to this appeal, Mr. Barfield was able to live in an apartment, to eat every day, to travel, to drive a vehicle, to be a student for at least two years, all in spite of his apparently dire financial condition. While this Court understands that he may have subsisted on borrowed money during some of that time, he also continued to benefit from the family business and from his ownership of rental property.
¶ 46. While contempt of court must be proven by clear and convincing evidence, the chancellor has substantial discretion in determining whether a party is in contempt. Lahmann v. Hallmon, 722 So.2d 614 (¶ 19) (Miss.1998); Shelton, 653 So.2d at 286; Cumberland v. Cumberland, 564 So.2d 839, 845 (Miss.1990). Based upon the evidence detailed above, this Court recognizes that Mr. Barfield was not without the means to petition the lower court for a modification of child support. Furthermore, we opine that the chancellor remained within his discretion in holding Mr. Barfield in contempt of the court's decree as it pertains to child support and medical expenses. The record includes substantial evidence to support the chancellor's finding, and Mr. Barfield failed to make a clear case that he was unable to pay the child support. Thus, we find that the chancery court was under no obligation to declare the attested property settlement agreement unreasonable or void, and we affirm the lower court's decision.

IV. CONCLUSION
¶ 47. This Court discerns that equity does not require rendering the property settlement agreement adopted into the divorce order void just because Mr. Barfield made a bad deal. The chancellor's conclusions are based upon substantial, credible evidence, and his finding Mr. Barfield in contempt of the divorce order does not constitute manifest error. Recognizing that the chancellor correctly applied the law and committed no abuse of discretion, we affirm.
¶ 48. THE JUDGMENT OF THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY CITING APPELLANT FOR CONTEMPT; AWARDING $84,693 TO *342 APPELLEE, AWARDING ATTORNEY'S FEES TO RESPONDENT DEFENDING AGAINST APPELLANT'S MOTION, MODIFYING APPELLANT'S FUTURE CHILD SUPPORT OBLIGATION TO $155 PER MONTH, AND REQUIRING APPELLANT TO PAY $100 PER MONTH ON THE ARREARAGE IS AFFIRMED. STATUTORY DAMAGES AND INTEREST ARE AWARDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., DIAZ, IRVING, LEE, MOORE AND THOMAS, JJ., CONCUR. PAYNE, J., CONCURS WITH SEPARATE WRITTEN OPINION.
PAYNE, J., CONCURRING:
¶ 49. While I concur completely with the well written majority opinion, I write separately to observe that this is more than just another contempt citation for nonpayment of child support. It points out the dire consequences that come to a lawyer who has been disbarred and is unable to find similarly compensated employment. Two observations I would mention. First, this should serve as a "wake up call" to lawyers that all the Rules of Professional Conduct are applicable every day of a lawyer's life and practice so that in one's own enlightened self-interest a lawyer should be ethical in all his or her dealings. Disbarment devastates one's life and can make one virtually unemployable. Disbarment, however, like polio, is a "preventable disease."
¶ 50. Second, the Mississippi Bar has a mechanism to aid lawyers who are in trouble, not just with chemical abuse, but with all forms of distress a lawyer faces: depression, debt management, family dysfunction, and even just dissatisfaction with the profession. Of course, it is better for the lawyer to use these services before one gets into trouble with the complaints counsel, but, even after disbarment, referral and other services may be available. That service is the Judges and Lawyers Assistance Program. It would behoove all of us in this profession in this State to familiarize ourselves with these availabilities for help early.
¶ 51. It is always sad to see a lawyer neglect his client, even when the client is himself. I concur in the opinion of the majority.
NOTES
[1] The State's authority to pursue this matter on Ms. Barfield's behalf emanates from Miss. Code Ann. § 43-19-31. The State's pleading is subject to Rule 81(d)(3) of the Mississippi Rules of Civil Procedure (M.R.C.P.), which provides instruction for initiating contempt actions. The Comment to Rule 81(d)(3) provides that "the pleading initiating the action should be commenced by complaint or petition only and shall not be taken as confessed" and further directs that "[i]nitiating Rule 81(d) actions by `motion' is not intended." Although the State titled its pleading "Motion for Citation for Contempt," we address it as a "petition" and advise the parties to utilize proper nomenclature in future pleadings.
[2] Mr. Barfield's "counter-motion" is properly denominated as a "motion" pursuant to M.R.C.P. 60(b).
[3] Mr. Barfield claims that he was unemployed at the time that the agreement was executed. He had recently been disbarred, but he was purportedly negotiating a job offer in Tennessee.
[4] Mr. Barfield takes umbrage with this comment and addresses it extensively in his brief. However, ascertaining that this comment is irrelevant to Mr. Barfield's assertions of error, we refrain from addressing it in our review.
[5] We refrain from addressing the assignment of dividends for the child, which resulted in an award of approximately $333 per month, because the terms of the agreement suggest that those dividends were to be paid in addition to child support and that the obligation to pay the dividends would continue after the obligation to pay child support ceased when the minor child reached the age of twenty-one years.
[6] Mr. Barfield refers to the chancellor's comment that "the amount called for in the first place was certainly way out of kilter, based on his employment history and so forth." Significantly, the chancellor continued by explaining the axiom that a party who executes an agreement in order to obtain a divorce must live with the consequences of that agreement.
[7] The record does not clearly indicate whether Ms. Barfield knew Mr. Barfield's employment situation when the agreement was executed.
[8] The State asserts on appeal that Mr. Barfield received a check for $45,000 as his share of proceeds from the family business. However, we decline to consider this alleged income in reviewing the chancellor's decision because that allegation was not presented to the chancellor or confirmed in the record.